FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2013 SEP 9 AM 9 17

STEPHAN HARRIS, CLERK
CHEYENNE

CHRISTOPHER A. CROFTS
United States Attorney
C. LEVI MARTIN
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003
Telephone: (307) 772-2124
Email: christopher.martin@usdoj.gov

SEAN RATLIFF, Trial Attorney (*Pro Hac Vice* Pending)
U.S. Equal Employment Opportunity Commission
303 E. 17th St., Suite 410
Denver, CO 80203
Telephone: (303) 866-1370
Facsimile: (303) 866-1375
Email: sean.ratliff@eeoc.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>DART ENERGY CORP, )<br><br>Defendant )<br><br>and )<br><br>J&R WELL SERVICE, LLC )<br><br>Defendant. ) | CIVIL NO. 13-CV-198 F<br><br>COMPLAINT – TITLE VII<br>JURY TRIAL DEMAND |

## COMPLAINT

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil

Rights Act of 1991 to correct unlawful employment practices on the bases of race, national

origin, and retaliation and to provide appropriate relief to a group of aggrieved individuals,

including Everett Aguilar, Kevin Armstrong, Mike Brasiel, Gary Burton, Willie Chavez,

Reginald Coleman, Steven Fisher, Don Longtine, Shawn Mapp, Laudente Montoya, Mark Mora,

Colby Ramos, Shane Riley, Earl Suffel, and Clan Triplett, who were adversely affected by such

practices. As alleged with greater particularity below, the United States Equal Employment

Opportunity Commission ("Plaintiff," "EEOC," or "Commission") alleges that Defendants Dart

Energy Corp. ("Dart Energy") and J&R Well Services, Inc. ("J&R Well") operate as a single or

joint employer and that together they failed to prevent and correct unlawful harassment based on

race and/or national origin. Defendants, EEOC alleges, created a hostile work environment

through repeated use of offensive racial and /or ethnic slurs and comments, unfavorable job

assignments, discipline, and demotions, and that Defendants discharged or constructively

discharged various aggrieved individuals because of their race and/or national origin. Defendants

also retaliated against those aggrieved individuals who opposed such practices and/or

participated in EEOC's process for filing and investigating charges of discrimination.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337,

1343 and 1345. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of

2

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3) ("Title VII"), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Wyoming.

## PARTIES

3.      Plaintiff, Equal Employment Opportunity Commission, is an agency of the United States of America charged with the administration, interpretation and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

4.      At all relevant times, Defendant Dart Energy, through its subsidiaries, has continuously been doing business in the State of Wyoming and has continuously had at least fifteen (15) employees.

5.      At all relevant times, Defendant Dart Energy has been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

6.      At all relevant times, Defendant J&R Well has continuously been doing business in the State of Wyoming and has continuously had at least fifteen (15) employees.

7.      At all relevant times, Defendant J&R Well has been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

3

## GENERAL ALLEGATIONS

### Conditions Precedent

8.      More than thirty days prior to the institution of this lawsuit, Kevin Armstrong, Mike Brasiel, Gary Burton, Reginald Coleman, Charles Fisher, Don Longtine, Laudente Montoya, Mark Mora, Colby Ramos, Shane Riley, and Earl Suffel filed charges of discrimination with the Commission alleging violations of Title VII by Defendants.

9.      Defendants received notice of the charges referenced in paragraph 8 above.

10.     The Commission conducted an investigation into the allegations contained in the charges reference in paragraph 8 above.

11.     On or about May 15, 2012, the Commission issued letters of determination as to each of the charges referenced in paragraph 8 above.

12.     The letters of determination issued by the Commission placed Defendants on notice that the Commission found "reasonable cause to believe that . . . [Defendants] engaged in a pattern or practice of discrimination in violation of Title VII."

13.     The letters of determination issued by the Commission placed Defendants on notice that EEOC found "reasonable cause to believe that . . . Charging Party and other aggrieved individuals" were subjected to "adverse terms and conditions of their employment, including without limitation, harassment, hostile work environment, discriminatory job assignments, discriminatory discipline, demotion, and discharge."

4

14.     The letter of determination issued by the Commission placed Defendants on notice that EEOC found "reasonable cause to believe that . . . [Defendants] further retaliated against Charging Party and other aggrieved individuals after they engaged in protected activity."

15.     On or about May 15, 2012, the Commission invited Defendants to engage in conciliation.

16.     The Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission and notified Defendants accordingly.

17.     All conditions precedent to the institution of this lawsuit have been fulfilled.

**Single or Joint Employers**

18.     Dart Energy is a Michigan corporation, with headquarters at 600 Dart Road in Mason, Michigan.

19.     Upon information and belief, Dart Energy has at all times since 2007 employed more than 501 employees.

20.     J&R Well is a Michigan Limited Liability Company.

21.     Upon information and belief, J&R Well has at all times since 2007 employed at least 101 employees.

22.     J&R Well is a wholly-owned subsidiary of Beckman Production Services, Inc. ("Beckman").

23.     Beckman is a wholly-owned subsidiary of Dart Energy.

24.     J&R Well's website indicates that it is a "Dart Energy Company."

25.     J&R Well's website, www.jandrwellservice.com, is registered to Dart Energy.

5

26.     The web administrator for both J&R Well and Dart Energy is, upon information and belief, the same person.

27.     Since at least 2005, the application for employment with J&R Well indicated that it was an application for Dart Energy.

28.     At times, the application for employment with J&R Well is accompanied by a letter thanking the applicant for expressing interest in Dart Energy Corporation.

29.     Online applications for jobs at J&R Well are processed through Dart Energy's website.

30.     Dart Energy performs the Human Resources function for J&R Well.

31.     Many of the personnel forms contained in the aggrieved individuals' personnel files are Dart Energy forms.

32.     Many of the personnel forms contained in the aggrieved individuals' personnel files indicate that J&R Well is merely a division of Dart Energy.

33.     J&R Well notifies Dart Energy and Beckman whenever an employee's status changes, such as a change of address or change of pay rate.

34.     Dart Energy requires supervisors at J&R Well to submit incident reports to Dart's HR department whenever an individual is injured on the job.

35.     Dart Energy retains authority to approve or disapprove all leaves of absence more than three days for employees that work at J&R Well.

36.     Dart can and has discharged employees who worked at J&R Well when they fail to submit appropriate paperwork for leaves of absence.

6

37.     On or about February 26, 2010, Dart discharged aggrieved individual Mike Brasiel from his employment with J&R Well.

38.     At all relevant times, the employee handbook for J&R Well was provided by Dart Energy.

39.     The handbook indicates that Beckman and J&R Well are divisions of Dart Energy.

40.     At all relevant times, the Policy and Procedure Manual used at J&R Well was provided by Dart Energy.

41.     The Policy and Procedure Manual used at J&R Well indicates that J&R employees are employees of Dart Energy.

42.     At all relevant times, Dart Energy provided employee benefits for those working at J&R Well.

43.     Dart Energy reserved the right to amend or terminate the employee benefits provided to employees of J&R Well.

44.     Information about employees, including the aggrieved individuals, who worked directly at J&R Well is contained in a common Human Resources Information System maintained by Dart Energy.

45.     Upon information and belief, information about Dart Energy employees is maintained in the same Human Resources Information System with information about J&R Well's employees.

7

46.     J&R Well's EEO-1 reports, for at least the years 2007 through 2010, were completed and submitted to the EEOC by Dart Energy.

47.     Dart Energy provides "service awards" for employees who work at subsidiaries, including employees at J&R Well and Beckman.

48.     Dart Energy provides vehicles to be used by certain J&R Well employees and pays for the maintenance of such vehicles.

49.     Employees who receive vehicles for J&R Well business sign acknowledgments concerning limitations of use. The acknowledgment identifies the employees as employees of Dart Energy.

50.     Dart Energy formerly employed a Corporate Safety Director, Ed Sarin, who was responsible for overseeing safety programs for all Dart Energy companies, including J&R Well.

51.     J&R Well's Safety Manager has historically reported to Dart Energy's Corporate Safety Director.

52.     The General Manager of J&R Well is supervised by the Vice President of Well Services at Dart Energy.

53.     Prior to 2013, J&R Well listed its principal address with the Wyoming Secretary of State as 600 Dart Rd. in Mason, Michigan, the same address as Dart Energy.

54.     Dart Energy purchased insurance coverage, including employment practices coverage, for J&R Well and Beckman operations.

55.     James Weigand, the Chief Financial Officer for Dart Energy for approximately the last six years, has also been the Vice President of both Beckman and J&R Well.

8

56.     One of the former Directors of Dart Energy, JoAnne E. Williams, also served as a Director for both Beckman and J&R Well.

57.     One of the Directors of Dart Energy, Edward Eberle, also served as a Director for both Beckman and J&R Well.

58.     Charles Henderson, Dart Energy's Executive Vice President and Chief Counsel for approximately the past 14 years, also has served as the Vice-Present of Legal Affairs and Secretary of both Beckman and J&R Well.

59.     Thomas Stapf, Dart Energy's Executive Vice President, Treasurer, and CFO, has also been the Treasurer for both Beckman and J&R Well.

60.     Because of their interrelated operations, common management, common ownership, and centralized control of labor relations, J&R Well and Dart Energy constitute a single employer or integrated enterprise.

61.     Because both J&R Well and Dart Energy exercised control of the terms and conditions of the aggrieved individuals' employment, the two companies constitute a joint employer.

**Events Which Gave Rise to this Suit**

62.     Beginning in 2005 and continuing, the aggrieved individuals, who are Native American, Black, Puerto Rican, and/or Hispanic, were subjected to harassment in the form of offensive racial/ethnic slurs and comments on a regular, if not daily, basis.

63.     The main perpetrator of such offensive racial and/or ethnic commentary was the Truck Supervisor at the Edgerton location, Ken Nelson.

9

64.    Area Manager Jim Ferguson and others also made offensive racial and/or ethnic comments.

65.    Examples of the offensive racial and/or ethnic commentary prevalent in the Defendants' workplace include all of the following:

      a.  Mr. Nelson and Mr. Ferguson referred to Native American employees by such names as "wagon burner", "dumb Indian", "lazy Indian", "redskin", "blanket ass", and "rug burner".

      b.  Mr. Nelson made comments to the effect of "Custer should have killed all the Indians," "Indians are all drunks and can't hold jobs," and "Indians are too stupid to understand their jobs."

      c.  Mr. Nelson and Mr. Ferguson referred to Hispanic employees by such names such as "burrito boy", "spic", "dirty Mexican", "dumb Mexican", "worthless Mexican", "wetback", and "beaner".

      d.  Mr. Nelson referred to shovels as "Mexican backhoes".

      e.  Mr. Nelson, on at least one occasion, indicated Mexicans were responsible for spreading swine flu.

      f.  Mr. Nelson and Mr. Ferguson referred to Black employees and applicants as "niggers".

      g.  On one occasion, Mr. Ferguson told Mike Brasiel that he wasn't hiring any more "niggers".

h. Mr. Ferguson also said that he thought the "niggers" were going to shoot him, referring to Black job applicants.

i. Mr. Ferguson threw away the applications of a number of Black job applicants.

j. A sign was posted on a white board in the trailer out at one of the rigs which said "no minorities allowed."

k. Mr. Nelson made comments to minority workers on more than one occasion along the lines of "this is a white man's job. If you can't handle it, leave."

l. If Mr. Nelson was unsure of an employee's race or national origin, he would ask and then proceed to refer to the person using racist terminology.

66. On multiple occasions, Mr. Ferguson was present when Mr. Nelson made offensive racial and/or ethnic comments, but Mr. Ferguson took no action to stop the offensive commentary or even criticize Nelson for using offensive racial and/or ethnic slurs.

67. On several occasions Mr. Nelson told Hispanic employees, including aggrieved individuals Laudente Montoya and Mike Brasiel not to speak Spanish because "we are Americans here."

68. Several of the aggrieved individuals were disciplined more harshly than their White counterparts for the same or similar infractions.

69. For example, aggrieved individuals Kevin Armstrong, Gary Burton, Don Longtine, and Mark Mora, were all disciplined for alleged policy violations that, when committed by White employees, were treated more leniently or ignored.

11

70.     Upon information and belief, White employees were given more work hours than minority employees.

71.     Certain aggrieved individuals such as Colby Ramos, Don Longtine, and Mike Brasiel were demoted while their White counterparts were not.

72.     Aggrieved individuals Everett Aguillar, Gary Burton, Clan Triplett, Laudente Montoya, and Mark Mora were discriminatorily discharged.

73.     The hostile work environment created by Defendants' practices was sufficiently severe that several non-White employees felt compelled to resign, including, without limitation Willie Chavez, Charles Fisher, Don Longtine, Colby Ramos, Shane Riley, and Earl Suffel.

74.     Many employees felt afraid to complain about the offensive racial and/or ethnic comments and other disparate treatment that they experienced.

75.     As early as February 2007, employees, including Kevin Armstrong, Mike Brasiel, Gary Burton, Charles Fisher, Don Longtine, Laudente Montoya, Mark Mora, Shane Riley, and Clan Triplett, complained to supervisors or other management, including to the Supervisory Mechanic Don Longtine, Area Manager Jim Ferguson, and Safety Manager Ray Gonzalez, about the offensive racial/ethnic commentary and/or about the disparate treatment because of race and/or national origin.

76.     In approximately February 2007, Kevin Armstrong and Don Longtine complained to Mr. Ferguson about Mr. Nelson's offensive comment that "Custer should have killed all the Indians."

12

77.     In response to their complaint, Mr. Ferguson told Armstrong and Longtine that they could quit their jobs.

78.     When Earl Suffel reported to a jobsite supervisor that someone had posted a sign saying "no minorities allowed," the supervisor told Suffel to stop being a crybaby.

79.     When Mr. Suffel reported the same incident to Area Manager Ferguson, he also indicated that Mr. Suffel should quit complaining.

80.     When Willie Chavez complained to his supervisor that he was being referred to as "boy," the supervisor told him to shut up and go back to work.

81.     On one occasion, when Don Longtine relayed to Area Manager Ferguson a complaint against Mr. Nelson, Mr. Ferguson responded that he was sick of everyone coming to him and that everyone needed to do their jobs.

82.     Area Manager Ferguson made it known that if employees went above his head, he would make their lives difficult.

83.     Defendants failed to take remedial action when employees complained of offensive racial and/or ethnic slurs, name-calling, comments, and the like.

84.     Often times, Defendants retaliated against employees who complained about the offensive racial/ethnic slurs, comments, and conduct in the workplace.

85.     Examples of such retaliation include but are not limited to the following:

### Discharge of Laudente Montoya

a.  On September 21, 2009, Laudente Montoya filed a charge of discrimination against Defendants.

13

b.  Notice of Montoya's Charge was sent to Defendants on or about September 23, 2009.

c.  On or about October 8, 2009, Laudente Montoya was discharged.

d.  Montoya was discharged less than three weeks after Defendants received notice of his charge of discrimination.

### *Discharge of Mark Mora*

a.  On October 8, 2009, Mark Mora filed a charge of discrimination against Defendants.

b.  Notice of Mora's Charge was sent to Defendants on or about October 9, 2009.

c.  On October 28, 2009, Mr. Ferguson and Mr. Nelson fired Mark Mora for an alleged violation of company policy.

d.  Mora was fired less than three weeks after he filed a charge of discrimination.

### *Discharge of Gary Burton*

a.  On October 23, 2009, Gary Burton filed a charge of discrimination against Defendants.

b.  Notice of Burton's Charge was sent to Defendants on or about October 23, 2009.

c.  On November 4, 2009, Mr. Ferguson and Mr. Nelson fired Gary Burton for failing to call in at the end of his shift.

d.  Failing to call in at the end of a shift is a minor policy infraction.

e.  Upon information and belief, no one other than Mr. Burton has ever been fired for failing to call in at the end of a shift.

14

f.   Burton was fired less than two weeks after he filed a charge of discrimination.

### *Demotion and other Retaliation against Mike Brasiel*

a.   On September 21, 2009, Mike Brasiel filed a charge of discrimination against Defendants.

b.   Notice of Brasiel's Charge was sent to Defendants on or about September 23, 2009.

c.   On or about October 8, 2009, Brasiel was demoted from mechanic to truck driver.

d.    When Brasiel was demoted, his cell phone and company truck were revoked.

e.   Then on October 29, 2009, Mike Brasiel slipped in the mud while at work, hit his head, and injured his back.

f.   As a result of his fall, Mr. Brasiel was injured and had to be transported from the worksite to the hospital.

g.   The day after Brasiel's work injury, Area Manager Ferguson stated on an incident report that he did not believe the injury was work related.

h.   Because Ferguson denied that Brasiel's injury was work-related, Brasiel was forced to take FMLA leave rather than receive workers compensation.

### *Retaliatory Demotion of Don Longtine*

a.   On September 21, 2009, Don Longtine filed a charge of discrimination against Defendants.

b.   On or about October 8, 2009, Mr. Longtine was effectively demoted.

    c.  Longtine was stripped of his status as a supervisor and forced to perform the job duties of his subordinates, Mike Brasiel and Laudente Montoya.

    d.  Longtine was demoted less than three weeks after filing a charge of discrimination.

### *Retaliation against Kevin Armstrong*

    a.  On September 21, 2009, Kevin Armstrong filed a charge of discrimination against Defendants.

    b.  Notice of Armstrong's Charge was sent to Defendants on or about September 23, 2009.

    c.  Less than one month later, on or about October 20, Kevin Armstrong received a final warning for alleged infractions of company policy.

    d.  Upon information and belief, Mr. Armstrong began receiving fewer hours beginning in October 2009.

### *Retaliation against Charles Fisher*

    a.  On or about May 2009, Charles Fisher reported harassment to Safety Manager Ray Gonzalez.

    b.  Gonzalez relayed Fisher's complaint to Area Manager Ferguson.

    c.  Within a month of making his complaint, Mr. Fisher was written up, suspended for three days, and placed on a six-month probation for allegedly not taking care of his truck.

    d.  Rather than endure further harassment and retaliation, Mr. Fisher resigned on

June 10, 2009.

### FIRST CLAIM FOR RELIEF

[Hostile Work Environment/Harassment – 42 U.S.C. § 2000e-2(a)]

86.    EEOC hereby incorporates the allegations contained in the preceding paragraphs
of this Complaint.

87.    Since at least 2005 Defendants engaged in unlawful employment practices in
violation of Section 2000e-2(a) of Title VII when it created and permitted a hostile work
environment and harassment against a group of aggrieved individuals based on their race and/or
national origin. This group includes, but is not necessarily limited to, Everett Aguilar, Kevin
Armstrong, Mike Brasiel, Gary Burton, Willie Chavez, Reginald Coleman, Steven Fisher, Don
Longtine, Shawn Mapp, Laudente Montoya, Mark Mora, Colby Ramos, Shane Riley, Earl
Suffel, and Clan Triplett

88.    All of the aggrieved individuals are Black, Hispanic, Puerto Rican, and/or Native
American.

89.    At all relevant times, Ken Nelson was a supervisor.

90.    At all relevant times, Jim Ferguson was a supervisor.

91.    The hostile work environment and harassment outlined in the preceding
paragraphs of this Complaint was sufficiently severe or pervasive to alter the conditions of the
aggrieved individuals' employment and create a hostile working environment.

17

92.     Numerous employees complained of the hostile work environment outlined in the preceding paragraphs.

93.     Defendants knew or should have known about the hostile work environment outlined in the preceding paragraphs.

94.     Defendants failed to take reasonable measures to prevent or correct the harassment outlined above and made matters worse by retaliating against individuals who made complaints.

95.     Prior to 2009 when the first of the aggrieved individuals filed charges of discrimination, Defendants conducted no training on race or national origin harassment.

96.     Prior to 2009, Defendants' policies on harassment were not consistently distributed to employees working for J&R Well.

97.     Mr. Nelson and Mr. Ferguson were never disciplined for their inappropriate and offensive racial and/or ethnic comments.

98.     Mr. Nelson and Mr. Ferguson were never disciplined for treating non-White employees less favorably than White employees, in terms and conditions of employment, including discipline, work hours, demotions, and reductions-in-force.

99.     The unlawful employment practices described above were intentional acts.

100.    The unlawful employment practices described above were done with malice or with reckless indifference to the federally protected rights of the aggrieved individuals.

101.    As a result of the events and actions described above, the aggrieved individuals were deprived of equal employment opportunities; deprived of wages, benefits and job training;

18

subjected to emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation; and were otherwise adversely affected as employees because of their race and/or national origin.

## SECOND CLAIM FOR RELIEF

[Wrongful Discharge /Constructive Discharge - 42 U.S.C. § 2000e-2(a)]

102. EEOC hereby incorporates the allegations contained in the foregoing paragraphs of this Complaint.

103. Defendants engaged in unlawful employment practices in violation of Section 2000e-2(a) of Title VII when they discharged or constructively discharged the employment of a group of aggrieved individuals because of their race and/or national origin. This group includes, but is not necessarily limited to, Everett Aguilar, Gary Burton, Willie Chavez, Charles Fisher, Don Longtine, Laudente Montoya, Mark Mora, Colby Ramos, Shane Riley, Earl Suffel, and Clan Triplett.

104. Defendants' actions were intentional and committed with malice or reckless indifference to the federally protected rights of the aggrieved individuals.

105. As a result of Defendant's discriminatory discharges, the aggrieved individuals were deprived of equal employment opportunities; deprived of wages, benefits and job training; subjected to emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation; and were otherwise adversely affected as employees because of their race and/or national origin.

19

## THIRD CLAIM FOR RELIEF

[Retaliation - 42 U.S.C. § 2000e-3(a)]

106.    EEOC hereby incorporates the allegations contained in the foregoing paragraphs of this Complaint.

107.    Defendants engaged in unlawful employment practices in violation of Section 2000e-3(a) of Title VII when they took adverse employment actions against a group of aggrieved individuals because they engaged in protected activities under Title VII, including but not necessarily limited to opposing discrimination, filing charges of discrimination, and/or participating in EEOC's process for filing and investigating charges of discrimination. This group includes, but is not necessarily limited to, Kevin Armstrong, Mike Brasiel, Gary Burton, Charles Fisher, Don Longtine, Laudente Montoya, Mark Mora, and Colby Ramos.

108.    Defendants' retaliation was intentional and committed with malice or reckless indifference to the federally protected rights of the aggrieved individuals.

109.    As a result of the events and actions described above, the aggrieved individuals were deprived of equal employment opportunities; deprived of  wages, benefits and job training; subjected to emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation; and were otherwise adversely affected as employees because of their opposition to discrimination.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

20

A.      Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, successors, assigns and all persons in active concert or participation with them, from engaging in any employment practice which discriminates on the basis of race and/ or national origin.

B.      Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, successors, assigns and all persons in active concert or participation with them, from engaging in retaliation.

C.      Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for employees regardless of race or national origin, and which eradicate the effects of Defendants' past and present unlawful employment practices.

D.      Order Defendants to make whole the aggrieved individuals by providing appropriate back pay and benefits with prejudgment interest, in amounts to be proved at trial, and other affirmative and equitable relief necessary to eradicate the effects of Defendants' unlawful employment practices, including but not limited to reinstatement or front pay in lieu thereof.

E.      Order Defendants  to make whole the aggrieved individuals by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including such things as job search expenses or relocation expenses or medical expenses not covered by an employee benefit plan, in amounts to be determined at trial.

F.      Order Defendants to make whole the aggrieved individuals by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices

21

complained of in the paragraphs above, including emotional pain, suffering, inconvenience, loss

of enjoyment of life, and humiliation, in amounts to be determined at trial.

     G.     Order Defendants to pay punitive damages for their malicious or reckless conduct

described in the paragraphs above, in amounts to be determined at trial.

     H.     Grant such further relief as the Court deems necessary and proper.

     I.     Award the Commission its costs in this action.

**JURY TRIAL DEMAND**

The Commission requests a jury trial on all questions of fact raised by its complaint.

Dated September 9, 2013.


C. LEVI MARTIN
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003
(307) 772-2124

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

P. David Lopez
General Counsel

Gwendolyn Young Reams
Associate General Counsel

Mary Jo O'Neill
Regional Attorney

Rita Byrnes Kittle
Supervisory Trial Attorney

/s/ Sean Ratliff
Sean Ratliff
Trial Attorney
(*pro hac vice* application pending)

22

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Denver Field Office
303 E. 17th Avenue, Suite 410
Denver, CO  80203
(303) 866-1370

NOTE: It is sufficient for service on the EEOC that pleadings, notices, and any other court documents be served on the Trial Attorneys.  Duplicate service is not required on the General Counsel and Associate General Counsel in Washington, D.C.